# EXHIBIT D

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC | 520-2025-00461 |
| New York State Division Of Human Rights | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Mr. Edward C. Washington

Phone No.: (917) 723-1132

Year of Birth: 2024

Mailing Address: 319 E Grant Ave

ROSELLE PARK, NJ 07204

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: AMERICAN EXPRESS NATIONAL BANK

No. Employees, Members: Under 15 Employees

Phone No.:

Mailing Address: 200 VESEY ST

NEW YORK, NY 10285, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Race, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 04/22/2024

Latest: 04/22/2024

THE PARTICULARS ARE:

I was hired by Respondent on or around January 10, 2014. I worked as an Account Manager, and reported to David Banovetz, Director, and Amy Dicker, Manager, until I was discharged on or about April 22, 2024.

While working for Respondent Mr. Banovetz lead with a level of incompetence that caused employees to be confused and disgruntled. After Mr. Banovetz took away one of my high paying accounts I filed an ethics complaint against him. I believe that because I am black the Respondent did not address my concerns and feel that I was not considered a whole person due to my race. The company harbors a practice of playing nice, and fail to investigate complaints against management. In or around the beginning of April 2024, while in a 1:1 meeting with Mr. Banovetz, he inquired about my ethics complaint against him. I advised Mr. Banovetz that the ethics complaint was still open. I was terminated on or about April 22, 2024.

I believe I was discriminated against due to my race and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Mr. Edward C. Washington

04/03/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary____________________________________________

Printed Name ____________________________________________

# CP Enclosure with EEOC Form 5 (06/24)

## Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (06/24).
2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT E

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/13/2026

**To:** Mr. Edward C. Washington
319 E Grant Ave
ROSELLE PARK, NJ 07204

Charge No: 520-2025-00461

EEOC Representative and email: PAUL ESPOSITO
INVESTIGATOR
PAUL.ESPOSITO@EEOC.GOV

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2025-00461.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
03/13/2026

Arlean Nieto
Acting District Director

**Cc:**
Meredith Bailey
Ogletree Deakins
155 N. Wacker Drive, Suite 4300
Chicago, IL 60606

Jennifer Oquendo
American Express Company
200 Vesey Street
New York, NY 10285

Amy Bennett
Ogletree Deakins
300 North Meridian St. Suite 2700
Indianapolis, IN 46204

NA NA
200 VESEY ST
NEW YORK, NY 10285

Katie Bayt
Ogletree Deakins
300 North Meridian St. Suite 2700
Indianapolis, IN 46204

Rhonda Almquist
American Express Company
1212 Northwood Drive
Delano, MN 55328

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2025-00461 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2025-00461 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# EXHIBIT F

Ogletree Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
*Attorneys at Law*
155 N. Wacker Drive, Suite 4300
Chicago, IL 60601
Telephone: 317-916-2149
Facsimile: 317-916-9076
www.ogletree.com

Meredith Bailey
317-916-2149
Meredith.bailey@ogletree.com

June 6, 2025

Paul Esposito
EEOC New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
Paul.esposito@eeoc.gov

**VIA EEOC PORTAL**

**RE: Edward Washington v. American Express National Bank**
**EEOC Charge No.: 520-2025-00461**

Dear Mr. Esposito:

American Express National Bank ("Amex") respectfully submits this Position Statement in response to the above-referenced Charge filed by former employee Edward C. Washington ("Charging Party").[1] As a threshold matter, the Charge is time-barred as the events giving rise to the allegations occurred more than 300 days before the filing of the Charge on April 3, 2025. Even if the Charge were timely—which it is not—Charging Party's allegations of race discrimination and retaliation are wholly without merit. Accordingly, Amex respectfully requests that the Commission dismiss the Charge with a finding of no probable cause.

[1] This response is based on Respondent's understanding of the facts and the information reviewed thus far and is submitted for the purpose of aiding the Equal Employment Opportunity Commission ("Commission") in its investigation and facilitating the informal resolution of this matter. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of Respondent's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Charging Party's allegations. Because additional facts likely would be uncovered through adversarial discovery or following a full investigation, Respondent in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, Respondent does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Charging Party's allegations. While acknowledging the Commission may provide a copy of this position statement to Charging Party, Respondent considers all information it provides to the Commission in connection with this matter to be confidential and requests the Commission restrict any dissemination of the information provided during the course of the investigation to only those people with a need to know. To that end, Respondent requests prior written notice if any of the information provided to the Commission during the course of investigation is to be released by the Commission to anyone outside the agency.

## I. FACTUAL BACKGROUND

### A. Amex's Commitment to Equal Employment Opportunity

Amex has a stated policy prohibiting discrimination based on **race**, color, religion, sexual orientation, gender identity, genetic information, sex, pregnancy, age, marital status, disability, veteran status or citizenship, as well as other protected classes under federal, state, and local law. (emphasis added). Amex employees receive a copy of the Company's Individual Treatment and Anti-Harassment Policy ("ITP") at the time they are hired. *See* **Exhibit A**. They must read the ITP and sign an acknowledgment that they have read and received the ITP as part of the new hire process. *See id.*

Moreover, Amex maintains a Code of Conduct Policy which it makes available to all employees through the Company's colleague facing intranet site, the Square. The Code of Conduct states, "…we are committed to ensuring equal employment opportunity and fair treatment. We must make all employment decisions based on job-related qualifications and without regard to race, ethnicity, gender, gender identity, disability, religion, sexual orientation, marital status, citizenship, age or any other legally protected status in each of the countries we operate." *See* **Exhibit B**.

### B. Charging Party's Employment with American Express.

Charging Party began his employment with Amex on July 21, 2014. During the period relevant to the Charge, Charging Party was employed as an Account Manager, within the Global Commercial Services ("GCS") division of the Company. The GCS division focuses on delivering Amex products and services to business customers, from small businesses to large corporations. An Account Manager is responsible for managing and growing Amex client portfolios, ensuring client satisfaction and maximizing the value that clients derive from Amex products, like corporate credit cards. Account Managers also serve as trusted client advisors, offering recommendations on Amex products to enhance their payment programs and a point of contact to solve client problems. For these reasons, the role requires a high level of professionalism and responsiveness to client needs. Charging Party reported to Manager, Amy Dicker (race: white), who, in turn, reported to Director David Banovetz (race: white).

#### 1. Charging Party Complains About a Colleague and His Removal from a Client Account.

In June 2023, Charging Party contacted the Company's Ethics Hotline after Amex leadership removed him from a large client account. Charging Party alleged that his managers had not given a clear explanation for his removal and that he believed his removal was the result of false, negative input from a colleague (race: white) with whom he shared the account. Charging Party claimed that the decision to remove him from the client account "lacked transparency," but he did not claim that it was in any way discriminatory.

Amex promptly initiated an investigation into Charging Party's concerns. As part of the investigation, an Amex representative interviewed Charging Party, the colleague whom Charging Party accused of providing false information, and Charging Party's manager, Ms. Dicker. During his interview, Charging Party did not identify any specific statements or conduct by the colleague that

would support his claims that she made false or negative remarks leading to his removal from the account. Instead, he leveled a series of personal grievances against his former manager, now skip-level manager, Mr. Banovetz. Charging Party alleged that Mr. Banovetz had some "bias" against him, which Charging Party himself attributed to his own delays in providing Mr. Banovetz with certain deliverables, such as documents and status reports. At one point, Charging Party briefly speculated that race might have played a role in their interpersonal conflict, but upon further questioning, he clarified that he did not have any evidence to support this suggestion and stated that he "did not want to make [his report] about race." In fact, Charging Party explicitly disclaimed any allegation of race discrimination. Charging Party attributed any challenges that he encountered with Mr. Banovetz's managerial style to Mr. Banovetz's purported unfamiliarity with the corporate card business—the area Charging Party was responsible for supporting.

The investigation revealed that Charging Party's removal was based on direct client feedback to Amex leadership regarding Charging Party's slow response time and performance issues related to the account. In her interview, Charging Party's manager, Ms. Dickers, explained that there were on-going issues with Charging Party posting timely information about the client account to Amex's internal systems, which, in turn, resulted in service delays for the client account. When Ms. Dicker, Mr. Banovetz, and other team leaders scheduled calls with Charging Party to address performance concerns, client feedback, and ultimately the decision to remove him from the client account, Charging Party failed to attend the scheduled meetings. Amex concluded the investigation, unable to substantiate any wrongdoing, and communicated the closure to Charging Party on September 18, 2023. Amex recommended that Ms. Dicker schedule a follow-up call with Charging Party to address any remaining questions regarding his removal from the client account and provide performance-related coaching, if needed.

**2. Amex Terminates Charging Party's Employment After He Engages in Multiple High-Risk Deceptive and Manipulative Sales Practices.**

On January 19, 2024, in a recorded client call, Charging Party violated the GCS US Business Conduct Standard Operating Procedures ("SOPs") when he provided an unsubstantiated guarantee that Amex would waive the client's late fees <u>under any circumstances</u>. Charging Party received a written warning documenting the misconduct, which he acknowledged on February 7, 2024. **Exhibit C**. Under the Company's progressive discipline policy, any subsequent violation within the following six months could result in disciplinary action, up to and including termination of employment.

About a month later, on February 20, 2024, a subsequent client call revealed three separate violations of the SOPs arising from one client interaction:

- Charging Party provided unsubstantiated assurances that the client would receive "a better incentive" in exchange for increasing the number of credit card charge volumes.

- Charging Party provided unsubstantiated representations that the client faced "zero – 100 % no" risk of credit limit reduction and that underwriting would unquestionably approve a higher credit limit.

- Charging Party made disparaging statements about Amex's underwriting personnel and processes to influence the sale.

Given the severity and recurrence of these violations—occurring just weeks after the initial violation—Ms. Dicker, with input from Mr. Banovetz and other leaders on the team, decided to terminate Charging Party's employment. Accordingly, Amex terminated Charging Party's employment, effective April 22, 2024, due to repeated high-risk deceptive and manipulative sales practices in clear violation of the SOPs.

## II. LEGAL ANALYSIS

### A. Charging Party's Allegations are Time-Barred.

At the outset, Charging Party's claims are untimely. For a claim of discrimination to be timely in a deferral state such as New York, a claimant must file a charge of discrimination with the EEOC within 300 days of the discriminatory act.[2] The events giving rise to the allegations occurred more than 300 days before the filing of the Charge on April 3, 2025. Specifically, Amex terminated Charging Party's employment for Sales Misconduct, effective April 22, 2024. Charging Party's filing occurred 384 days after the termination—exceeding the statutory filing deadline by 84 days. This untimeliness alone warrants complete dismissal of the Charge.

### B. Charging Party's claim for Race Discrimination Fails as a Matter of Law.

Even if Charging Party's allegations were timely (which Amex disputes), he cannot state a claim for discrimination based on his race. To support a disparate treatment claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), Charging Party must demonstrate that: (1) he belongs to a protected class; (2) he was meeting Amex's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *see Zheng-Smith v. Nassau Health Care Corp.*, No. 20-CV-3544, 2021 U.S. App. LEXIS 27084, 2021 WL 4097316, at *1 (2d Cir. Sept. 9, 2021) (listing the four criteria to establish a *prima facie* case of discrimination under Title VII).

Charging Party cannot satisfy these elements with respect to his removal from the client account in June 2023 because he was not meeting Amex's legitimate performance expectations. Charging Party's chronic performance deficiencies—including service delays due to his failing to timely update Amex's internal systems with relevant account information —prompted negative client feedback and ultimately led to the client requesting that he be replaced on the account. This feedback aligned with internal leadership concerns and reflected a failure to meet the fundamental requirements of the Account Manager role for the account. Accordingly, Charging Party cannot establish that he was performing satisfactorily, and his disparate treatment claim fails as a matter of law. Moreover, there is no evidence that any similarly situated Account Managers outside of Charging Party's protected class engaged in comparable conduct and retained on client accounts. As such, Charging Party cannot demonstrate that he was treated less favorably than others under similar circumstances, further defeating his disparate treatment claim.

---

[2] 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); *Thomson v. Odyssey House*, No. 14 Civ. 3857 (MKB), 2015 U.S. Dist. LEXIS 125887, 2015 WL 5561209, at *6 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016).

Charging Party's *prima facie* case similarly fails with respect to his discharge. By early 2024, Amex had documented four violations of the SOPs relating to deceptive sales practices during client calls. On February 7, 2024, Charging Party received a written warning explicitly stating that any subsequent violation within six months could result in employment termination. Less than thirty days later, a recorded client call revealed three additional breaches of the same SOPs. These serious, repeated violations reflect Charging Party's clear failure to meet Amex's legitimate performance expectations and warranted termination of his employment. Furthermore, Charging Party has not identified any similarly situated Account Manager outside his protected class who engaged in comparable repeated misconduct and was not disciplined. As such, to the extent Charging Party asserts that his employment termination was motivated by discriminatory animus based on his race, that claim is completely unsupported and must also be dismissed.

Even assuming, *arguendo*, that Charging Party could establish a *prima facie* case of discrimination based on his race (which Amex disputes), his claim still fails because Amex has articulated legitimate, non-discriminatory reasons for its employment actions, as described above. Amex acted consistent with Company policies when it removed him from the client account and later terminated his employment. Charging Party cannot demonstrate that these reasons were false, inconsistent, or applied in a discriminatory manner. As such, there is no basis to infer that Amex's legitimate reasons were a pretext for unlawful discrimination and any claims on this basis should be dismissed.

**C. Charging Party's Retaliation Claim is Also Without Merit.**

Charging Party's assertion that Amex retaliated against him by terminating his employment is unsupported and fails as a matter of law. To establish a *prima facie* case of retaliation under Title VII and corollary state law, Charging Party must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pattanayak v. Mastercard Inc.*, 2022 U.S. Dist. LEXIS 33055, at *14 (S.D.N.Y. Feb. 24, 2022). Charging Party cannot satisfy these elements for multiple, independent reasons.

First, Charging Party cannot establish that he engaged in a protected activity. Protected activity under Title VII requires an employee to either oppose unlawful employment practices or participate in proceedings under the statute. Contrary to the allegations in the Charge, Charging Party never filed an "ethics complaint" against Mr. Banovetz, nor did he assert that he was subjected to race-based discrimination or state that he was "not considered a whole person due to his race."[3] Rather, Charging Party's 2023 complaint raised only interpersonal concerns and an alleged "lack of clarity" surrounding the reasons for his removal from a client account—none of which constitute protected activity under Title VII. *See, e.g.*, *Rojas v. Roman Cath. Diocese of Rochester,* 660 F.3d 98, 107-08 (2d Cir. 2011) ("Implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiffs [complaint] was directed at *conduct prohibited by Title VII*") (emphasis in original). In fact,

---

[3] Indeed, when asked during the 2023 complaint investigation whether his concerns involved racial bias, Charging Party admitted that he had no evidence to support such a claim and stated that he "did not want to make [his report] about race." He expressly disclaimed any allegation of race discrimination during the investigation.

when the investigator specifically asked whether Charging Party was alleging that his removal from the account was the result of racial bias, Charging Party denied any complaint on that basis. Because Charging Party did not engage in protected activity, he cannot establish a causal connection, and his retaliation claim must be dismissed on this basis alone.

Even if Charging Party had engaged in protected activity in 2023 as he claims (which Amex denies), he still cannot establish a causal connection between that activity and his employment termination. Amex terminated Charging Party's employment in April 2024 for engaging in serious sales-related misconduct during client calls. This misconduct occurred more than nine months after his alleged complaint in 2023 and the violations were documented in the client calls, which were recorded for quality and training purposes. *See, e.g., Krasner v. City of N.Y.,* et al., 11 Civ. 2048 (2013) (stating that a nine-month gap is too long a time period for the Court to find an inference of retaliatory animus); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting that temporal proximity must be "very close."). This substantial gap in time between Charging Party's complaint and his discharge, coupled with intervening, well-documented performance issues unrelated to any protected activity, precludes any finding of a causal connection, and Charging Party's retaliation claim should be dismissed.

Finally, even if Charging Party could establish a *prima facie* case of retaliation (which he cannot), Amex has articulated a legitimate, non-retaliatory reason for his termination: repeated, high-risk violations of Company policy during client sales calls in January and February 2024. The burden thus shifts to Charging Party to show that this reason was a pretext for retaliation—a burden that he cannot meet. Importantly, the individual Charging Party accuses of retaliating against him, Mr. Banovetz, was neither his direct supervisor nor the final decision-maker with respect to his employment termination. That role was held by Ms. Dicker, who made the ultimate decision to terminate Charging Party's employment based on his policy violations and delivered the termination decision. In short, Charging Party has not identified any facts that would permit an inference that Amex retaliated against Charging Party when it terminated his employment in April 2024. Accordingly, his retaliation claim should be dismissed in its entirety.

## III. CONCLUSION

Based on the foregoing reasons, Amex respectfully requests the Commission dismiss the Charge without further processing and issue a finding of "no probable cause."

Sincerely,

Meredith C. Bailey

Meredith C. Bailey

# Exhibit A

AMERICAN EXPRESS ®

# Individual Treatment Policy Acknowledgement Form

American Express Company, and each of its subsidiaries and affiliates (collectively the "Company"), is committed to treating every individual with dignity and respect. We seek to provide a work environment free from discrimination and harassment of any kind. It is our policy that there be no discrimination against any person on the grounds of race, color, religion, national origin, disability, age, sex, marital status, sexual orientation, gender identity, veteran status or citizenship. We also seek to maintain a work environment free from any harassment. Harassment is defined as behavior that is offensive to individuals or to groups, such as unwelcome sexual advances, uninvited suggestive remarks of a sexual nature; sexist or racist comments; religious slurs; or ethnic jokes. Any discriminatory treatment or harassment of employees, financial advisors, or contractors, which is a violation of our Company's values or federal or state law, will be met with appropriate disciplinary action, up to and including termination. Leaders are responsible for enforcing and complying with anti-discrimination and anti-harassment laws.

I hereby acknowledge that I have received a copy of the full text of the Individual Treatment Policy. I have read the Individual Treatment Policy and understand that I must comply with it as a condition of my employment.

[signature]
Signature

Edward Washington
Print Name

July 21st, 2014
Date

This document does not create a contract of employment or a contract for any specific term or condition of employment between American Express and an employee. The relationship between American Express and an employee is at-will, meaning that either the employee or the company may terminate it at any time for any reason, with or without advance notice or progressive disciplinary action. The company reserves the right to make changes in or discontinue company policies, compensation plans, benefits and programs as it deems appropriate and these changes may be implemented even if they have not been communicated in this (or by change to this) document or otherwise.

If this document refers to any company benefit program, it describes only certain highlights of the company's benefit program. It does not supersede the actual provisions of the applicable plan documents, which in all cases are the final authority. The applicable plan administrator has the sole authority and discretion in determining eligibility and in interpretation and administration of the plans.

American Express takes reasonable efforts to ensure the accuracy of the contents of policy documents and in the administration of its policies and programs. The company does not assume responsibility for consequential damages caused by administrative or clerical errors.



RECEIVED 07/28/2014

# Exhibit B

# OUR COMMITMENT
## TO EACH OTHER

### BLUE BOX VALUES

**WE RESPECT PEOPLE.**
We trust and respect one another for who we are and what we contribute. We are accountable to one another and empower every voice through open, courageous dialogue so others feel heard.

**WE EMBRACE DIVERSITY.**
We see diversity of people and experiences as fuel for the creativity and innovation we need to be and deliver our best.

**WE STAND FOR EQUITY & INCLUSION.**
We do not tolerate bias that excludes or minimizes anyone – all people belong. We're committed to ensuring that we have a welcoming and inclusive culture where everyone's voice matters and where people of all races, ethnicities, genders, gender identities, sexual orientations, ages, religions, disabilities and viewpoints can reach their potential, perform at their best and thrive.

### TREATMENT OF COLLEAGUES AND OTHERS

**We must treat each other and anyone we interact with on behalf of our Company with respect and dignity.**

Treating everyone in the workplace with respect is a Company value that applies to each of us. We are expected to treat all our colleagues, and everyone with whom we work, with fairness and dignity.

### EQUAL EMPLOYMENT OPPORTUNITY

**We must support our Company's commitment to diversity and equal employment opportunity.**

As part of our Blue Box Values and as an equal opportunity employer, we Embrace Diversity and Stand for Inclusion. One way we live those values is by committing to find the best candidates for open roles, candidates who hold the unique skills necessary for the roles, and who can bring diverse experiences and perspectives to those roles. With inclusive teams and business practices, creativity and productivity grow, making more room for overall success. Along with these values, we are committed to ensuring equal employment opportunity and fair treatment. We must make all employment decisions based on job-related qualifications and without regard to race, ethnicity, gender, gender identity, disability, religion, sexual orientation, marital status, citizenship, age or any other legally protected status in each of the countries in which we operate.

Please refer to your local, market-specific policy regarding individual treatment and anti-harassment, Global Sexual Harassment Policy Statement or similar policies for more information.

If you believe you or someone else has been discriminated against, you should report the situation to your leader, local Colleague Experience Group representative or the Amex Ethics Hotline.

# Exhibit C

# GCS US Documented Discussion Acknowledgement Form

**Date of Misconduct:**

**1/19/2024**

**Date of Discussion:**

**2/7/2024**

**Employee Name:**

**Edward Washington**

**Employee ID:**

**6370752**

**Job Title:**

**Client Manager**

**Segment (e.g., G&L, SME, COS, etc.):**

**G&L**

**Sub-segment (e.g., TSE, AD, etc.)**

**PRG**

**Leader Name:**

**Amy Dicker**

**Details of Discussion:**

*Edward and I met in person and we reviewed the misconduct. We discussed why it was a misconduct and how to approach these types of conversations moving forward. He understood the compliance piece and why it was a misconduct.*

**THIS FORM IS FOR INTERNAL GCS OE USE ONLY. PLEASE RETURN THE COMPLETED FORM TO GCS OE. DO NOT FORWARD TO COLLEAGUE & LABOR RELATIONS.**

# GCS US Documented Discussion Acknowledgement Form

**By checking this box, you acknowledge that the discussion took place with the impacted Colleague on the aforementioned date: ☒**

**THIS FORM IS FOR INTERNAL GCS OE USE ONLY. PLEASE RETURN THE COMPLETED FORM TO GCS OE. DO NOT FORWARD TO COLLEAGUE & LABOR RELATIONS.**